GARRET MOOSE vs. MASSACHUSETTS INSTITUTE OF
TECHNOLOGY & others.[1]

No. 96-P-596.

Middlesex. March 26, 1997. - August 26, 1997.

Present: PORADA, SMITH, & IRELAND, JJ.

*Negligence,* Athletics, Foreseeability of harm. *Practice, Civil,* Judgment
notwithstanding verdict, New trial, Judgment, Amendment. *Damages,* Loss
of earning capacity, Interest. *Evidence,* Prior misconduct.

At the trial of a negligence action against an educational institution and two
track and field coaches seeking damages for injuries the plaintiff, a former
student, had sustained while practicing pole vaulting at the institution, the
evidence was sufficient to support the jury's finding that the defendants
should have reasonably foreseen the risk that the plaintiff would be injured:
the judge correctly denied the defendants' motion for a required finding of
not guilty [425] and for a new trial on the issue of liability [426].

In a civil action, there was no merit to the defendants' contention that the
judge did not properly exercise his discretion in denying the defendants'
motion for a new trial. [426-427]

In a negligence case, the judge did not abuse his discretion in refusing to
grant a new trial on the issue of damages, where the jury's award was
neither greatly disproportionate to the injury proved nor did it amount to a
miscarriage of justice. [427-428]

Where, at the trial of a negligence action, the judge allowed the defendants to
present evidence and argue that the plaintiff's expulsion from college for
disciplinary reasons would have a negative impact on the plaintiff's future
earning capacity, there was no error in the judge's excluding from evidence
the precise reason for the expulsion. [428-429]

In a negligence action, prejudgment interest was properly calculated on the
jury's award of damages for lost earning capacity. [429-430]

CIVIL ACTION commenced in the Superior Court Department on
January 20, 1994.

The case was tried before *Charles T. Spurlock,* J.

*Daryl J. Lapp* for the defendants.

[1]Paul Slovinski and Halston Taylor.

*Daniel J. Johnedis* for the plaintiff.

SMITH, J. The plaintiff, Garret Moose, filed a negligence action against the Massachusetts Institute of Technology (MIT) and two of its track and field coaches, Paul Slovinski and Halston Taylor, seeking damages for injuries sustained while Moose was practicing pole vaulting at the institution. The plaintiff alleged that the defendants were negligent with respect to their coaching techniques and the equipment they furnished to him at the time he was injured. In response to special questions a jury found that each defendant, as well as the plaintiff, was negligent and that the defendants' negligence was the proximate cause of the plaintiff's injuries. The jury assessed damages at $615,000. The percentages of negligence were attributed as follows: plaintiff - fifteen percent, MIT - forty-five percent, Taylor - twenty-five percent, Slovinski - fifteen percent. The court entered judgment in the sum of $522,750 after deducting fifteen percent from the award for the plaintiff's negligence. The judgment provided that MIT's liability was $20,000 plus interest and costs because it was a charitable organization.

After the verdicts, the defendants filed a motion for judgment notwithstanding the verdicts or, in the alternative, for a new trial, a remittitur, or an amendment of the judgment. The judge denied the defendants' motion, and on appeal, the defendants claim error. The defendants also contend that the judge committed error by excluding certain evidence and by refusing to apportion the damage award and amend the judgment by deleting interest.

1. *Denial of defendants' motion for judgment notwithstanding the verdicts.* When considering a judge's denial of a motion for judgment notwithstanding the verdict, this court's task is to determine "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). "We do not weigh the evidence or consider the credibility of the witnesses." *Conway* v. *Smerling*, 37 Mass. App. Ct. 1, 3 (1994), citing *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). "Evidence that contradicts the testimony of the nonmoving party is to be ignored." *Conway* v. *Smerling*, 37 Mass. App. Ct. at 3, citing *Bennett* v. *Winthrop Community Hosp.*, 21 Mass.

App. Ct. 979, 982 (1986). Viewing the evidence in the light most favorable to the plaintiff, the jury could have found the following facts.

Pole vaulting is a sport in which the object is to obtain the maximum vertical lift in order to clear a horizontal bar set at some height above the ground. In competition, after vaulters have cleared the bar, it is then adjusted upwards until a winner emerges.

To be able to go over the bar, a vaulter takes an approach run towards the bar carrying a long pole. When the vaulter gets near the bar, he places one end of the pole into the vaulting box — an indentation in the ground almost directly beneath the bar. The box slants downward at the bottom and has metal sides. Once the pole is planted in the box, the vaulter uses the momentum from his approach run to bend the pole. When the pole bends back, the vaulter is lifted upwards and hopefully over the bar. Once over the bar, the vaulter lands on a foam mattress called the landing pit which cushions the vaulter's fall.

The defendant Slovinski, who had been the pole vaulting coach since November, 1990, was coaching Moose at the time of the accident. The defendant Taylor was head track and field coach and responsible for supervising Slovinski's activities as pole vaulting coach. Taylor's functions as head track and field coach included supervising the sports equipment in order to make sure it was safe, recommending the purchase of new equipment, and providing a safe environment for MIT track athletes.

In January of 1991, the plaintiff was a senior at MIT, majoring in aeronautical engineering. He was also a member of MIT's men's track and field team and had been involved in pole vaulting since the spring of his freshman year. On January 21, 1991, the day of the accident, the plaintiff was practicing pole vaulting under Slovinski's direct supervision at MIT's indoor track and field facility. The plaintiff was injured when after executing a pole vault, his heels hooked on the back edge of the landing pit and he fell backward, striking his head on the hard track surface. The back of the pit abutted the indoor track; the back left corner of the pit was two to three inches from the inside lane of the indoor track and the right rear corner was about two feet from the running surface. The track was made of concrete, covered with a thin layer of rubber.

The pit was purchased in 1980 and was thirteen feet in length;

the minimum length required by NCAA rules was twelve feet with a recommended length of sixteen feet. Pits with more length were available since at least 1981 but a budgeting crisis at MIT affected the track team and the coaches' ability to purchase new equipment. About a year and one-half after the accident, Taylor had the pit replaced with one that was seventeen feet long.

Both Slovinski and Taylor had witnessed, or at least were aware of, vaulters bouncing off the pit mattress and landing over the sides and front of the pit resulting in the vaulter sustaining second impact injuries. The day of the accident there were no pads at the back or sides of the pit although, in the past, the coaches had placed pads on the sides and sometimes at the back of the pit. Slovinski was aware that some colleges used supplemental padding at the back of the pit. Prior to the accident, Taylor never discussed the padding issue with Slovinski. At the time of the accident, supplemental padding was available and Taylor could have ordered that pads be placed in the area at the back of the pit.[2]

On January 21, 1991, pursuant to Slovinski's instructions, the plaintiff was using a training pole to practice pole vaulting drills. There was evidence that the training pole that was being used by the plaintiff was too light for the plaintiff's weight.[3] The selection of a soft training pole for a heavy, fast athlete places the athlete at serious risk of a "blow through."[4]

After performing a number of drill techniques, Slovinski

---

[2]The plaintiff's expert, Earl Bell, testified that supplemental padding should always be used around the pit's entire perimeter, especially around the back of the pit where the most serious injuries occur. Bell also testified that in his opinion, it was an unsound practice to locate the pit so that it abutted the hard track surface and it was unreasonable to fail to pad the hard surfaces abutting the pit.

Bell also criticized the instructions and supervision given to the plaintiff before the accident.

[3]A training pole is a more flexible pole than a competition pole. Because it is more flexible, it is easier to bend; therefore, vaults may be practiced at slower speeds. Although there was a factual dispute as to the exact characteristics of the pole that the plaintiff was using when he was injured, the jury were free to accept the plaintiff's testimony that he was using a thirteen foot pole which was intended for persons weighing from 120-150 pounds. At the time of the accident, the plaintiff weighed 175 pounds.

[4]A "blow through" is a term used in track and field circles to describe over penetration of the pole vault landing pit. It occurs when a vaulter uses a pole too soft and small for his weight, speed, and abilities. As the vaulter jumps,

instructed the plaintiff to combine two of the vaulting techniques and go through the full vaulting motions. The approach run for these vaults was fifty feet and the plaintiff was to make his approach at about one-half his normal speed. Slovinski told the plaintiff to use the same training pole for the full vaults.

The plaintiff performed the first two of the full vaults. After he performed each vault, Slovinski gave him pointers on his performance. Before each vault, except the last one, Slovinski told the plaintiff to keep his speed down. However, after at least one of these vaults, he landed on the center of the pit, beyond where he should have landed. That landing indicated that he needed either to use a heavier pole, raise his grip, or shorten his approach run. Although proper coaching technique requires that these adjustments be made, Slovinski did not order any of these adjustments nor did he warn the plaintiff that he was overpenetrating.

A coach who is teaching proper pole vaulting techniques should have a vaulter under observation during the vaulter's entire approach run. Once a coach notices that a vaulter is running too fast, the coach should order the vaulter to abort the vault. In the past, other coaches had interrupted the plaintiff's vaults at various stages due to safety concerns, including when he was twenty-five feet into the vault approach run.

Slovinski did not observe the plaintiff's final approach run until the plaintiff had completed twenty-five feet of that run. When Slovinski first observed the plaintiff, he thought the plaintiff was running too fast, and he knew the plaintiff was going to make a bad vault. Slovinski did not instruct the plaintiff to slow down or to abort his vault.

When the plaintiff made the vault, he went up about thirteen feet; when he landed, his heels hooked on the back edge of the pit and he fell backward, striking his head on the hard track surface. Immediately after the accident, Taylor found the plaintiff lying on the track unconscious and convulsing.

The plaintiff was taken to Massachusetts General Hospital where he was diagnosed as having sustained a skull fracture with associated contusions to the brain. While the plaintiff was hospitalized, Slovinski visited him and told him that he was having nightmares and he felt that the accident was his fault.

the pole overbends sending the vaulter to the back of the pit instead of upward to the bar.

Slovinski also told the plaintiff that when he saw him on his final approach it occurred to him that he had not reminded him to keep his speed down, but he did not say anything to the plaintiff because he did not want to break the plaintiff's concentration.

On appeal, the defendants claim that they are entitled to judgments notwithstanding the verdicts, because there was no evidence to support a finding that they should have reasonably foreseen that the plaintiff would land beyond the back of the pit and hit his head on the track surface.

The defendants appear to have misinterpreted the law pertaining to reasonable foreseeability. It is only the risk which results in the harm that must be reasonably foreseeable, not the precise manner of the accident or the extent of the harm. *Luz* v. *Stop & Shop, Inc., of Peabody*, 348 Mass. 198, 204 (1964) ("To be held liable the defendant need not have foreseen the precise manner in which the injuries occurred"). See Restatement (Second) of Torts § 435(1) (1965) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable").

The question whether the risk of injury was foreseeable is almost always one of fact. *Simmons* v. *Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992). See *Glick* v. *Prince Italian Foods of Saugus, Inc.*, 25 Mass. App. Ct. 901, 902 (1987). From the evidence before the jury, the plaintiff's accident was reasonably foreseeable by the defendants. The length of the landing pit and its location very close to a hard surface did not provide a safe environment for pole vaulters. It was also reasonably foreseeable that a vaulter using a training pole too light for his weight and running too fast on his approach run, would be carried across the pit and upon landing, end up beyond the back of the pit thereby incurring injury. Accordingly, the motion was properly denied.

2. *Denial of defendants' motion, in the alternative, for a new trial.* The defendants claim that the judge erred by denying their motion for a new trial because the jury's verdict on liability and damages was against the clear weight of the evidence. Further, they argue that certain statements made by the judge during a sidebar conference mandate a finding that the judge abused his discretion by denying the defendants' motion for a new trial.

a. *Against the weight of the evidence.* "It is a well-established principle that '[t]he granting or denying of a new trial on the ground that the verdict is against the weight of the evidence rests in the discretion of the judge.' " *Robertson* v. *Gaston Snow & Ely Bartlett,* 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989), quoting from *Bergdoll* v. *Suprynowicz,* 359 Mass. 173, 175 (1971). The judge's denial of the defendants' motion for a new trial "will only be disturbed if the judge abused his discretion." *Turnpike Motors, Inc.* v. *Newbury Group, Inc.,* 413 Mass. 119, 127 (1992). "Ruling on a motion for a new trial presents a limited question of fact, because the judge should not decide the case as if sitting without a jury; rather, the judge should only set aside the verdict if satisfied that the jury 'failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.' " *Robertson* v. *Gaston Snow & Ely Bartlett,* 404 Mass. at 520, quoting from *Hartmann* v. *Boston Herald-Traveler Corp.,* 323 Mass. 56, 60 (1948). Thus, "a judge should exercise this discretion only when the verdict 'is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.' " *Turnpike Motors, Inc.* v. *Newbury Group, Inc.,* 413 Mass. at 127, quoting from *Scannell* v. *Boston Elev. Ry.,* 208 Mass. 513, 514 (1911).

Here, the defendant's argument is based "on a marshaling of only evidence favorable to [the defendants] (and, therefore, an ignoring of contrary evidence)." *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.,* 417 Mass. 115, 123-124 (1994). There was ample evidence supporting the jury's verdict, so it cannot reasonably be said that the verdict was "the product of bias, misapprehension or prejudice." *Turnpike Motors, Inc.* v. *Newbury Group, Inc.,* 413 Mass. at 127, quoting from *Scannell* v. *Boston Elev. Ry.,* 208 Mass. at 514. Therefore, upon our review of the evidence on the issues of negligence and foreseeability, *supra*, we rule that the judge did not abuse his discretion in denying the defendant's motion for a new trial on the issue of liability.

b. *Judge's statements at trial as grounds for a new trial.* Relying on certain statements made by the judge during a side-bar conference, the defendants argue that "the judge believed that a verdict against the defendants would be against the clear weight of the evidence, and he never altered that view prior to

the announcement of the jury's verdict"; therefore, his "summary denial of the defendants' motion [for a new trial] was an abuse of his discretion, because it was a complete abdication of that discretion."

During a sidebar conference held immediately before the defendants' cross-examination of the plaintiff (the last witness for the plaintiff's case) the judge said to plaintiff's counsel, "I'm going to tell you, and you can talk to your client on break, he's going to get zero from this jury . . . . He's going to get nothing from the jury."

The defendants' argument is without merit. There is no evidence in the record indicating that the judge continued to have the opinion at the close of the trial that the plaintiff would "get zero from this jury," or that the judge ever expressed any concerns that a finding of liability was against the clear weight of the evidence.

c. *Denial of motions for a new trial on the issue of damages.* The defendants claim that the judge erred in denying their motion for a new trial on the issue of damages because the jury's award of damages was excessive and against the clear weight of the evidence, any award of damages for lost earning capacity was speculative, and the evidence did not support an award of substantial damages for pain and suffering. The defendants also argue that they are entitled to a new trial on the issue of damages because the judge erred in excluding evidence of the reason for the plaintiff's expulsion from MIT.

"An appellate court will not find an abuse of discretion in the judge's refusal to grant a new trial on the ground of excessive damages '[u]nless the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice.' " *Mirageas* v. *Massachusetts Bay Transp. Authy.*, 391 Mass. 815, 822 (1984), quoting from *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 787 (1975). In addition, "motions for a new trial on the theory that the damages were inadequate or excessive 'ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result.' " *Walsh* v. *Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 292 (1993) (citations omitted).

The following facts were adduced at trial on the issue of damages. The plaintiff sustained a fractured skull and contusions to the brain as a result of the accident. He spent two

weeks at Massachusetts General Hospital and five days at Spaulding Rehabilitation Hospital. His treating physician testified that while the plaintiff was hospitalized, he experienced hypersensitivity to sound, sensitivity to light, difficulty with logic and word finding, as well as difficulty organizing information, solving problems, and switching from one idea to another.

The plaintiff was discharged from the hospital on February 8, 1991. Upon his release from the hospital, the plaintiff returned to MIT and continued to actively pole vault for the men's track and field team. The plaintiff, however, lacked the motor coordination to do complex physical activity. The plaintiff continued to experience hypersensitivity to sound and difficulty with word choices. He also experienced loss of his sense of smell and taste and had a reduced ability to scan near material with his right eye.

In regard to his school work, the plaintiff found that he was so exhausted that sitting through classes and trying to do homework was beyond his stamina; he was also having trouble absorbing the material and making the deductions that were needed in order to be successful. Further, the plaintiff experienced episodes of double vision and blurry vision, especially while trying to read at length.

At the plaintiff's May 14, 1991, physical examination, his doctor noted that the plaintiff continued to have problems with visual accommodation, hypersensitivity to sound, concentration, and word finding. He was also experiencing changes in his personality function manifesting itself in the form of increased irritability, difficulty inhibiting anger, and rage attacks. All of the symptoms were consistent with his head injury.

There was evidence that as a result of the accident, the plaintiff had a lost earning capacity of $25,000 per year and based on that figure, there was testimony from the plaintiff's expert that the plaintiff's lifetime lost earning capacity, discounted to present value, was $1,309,835. Thus, in light of these facts, we hold that the judge did not abuse his discretion in refusing to grant a new trial on the issue of damages because the jury's award of $615,000 was neither greatly disproportionate to the injury proven nor do we think it represents a miscarriage of justice.

3. *Exclusion of certain evidence.* On May 6, 1991, the plaintiff was expelled from MIT "for disciplinary reasons." The specific reason for the plaintiff's expulsion was his theft of ap-

proximately $40,000 worth of computer equipment on three separate occasions prior to his accident. The judge excluded evidence of the thefts as the reason for the expulsion. The defendants claim error.

The judge allowed the defendants to present evidence that the plaintiff was expelled from MIT for disciplinary reasons as a result of events which occurred prior to his accident and which were unrelated to his accident. The defense was also allowed to present evidence that this expulsion would negatively impact on the plaintiff's ability to secure employment. Further, defense counsel was also allowed to argue to the jury that the reason the plaintiff could not complete his degree at MIT and secure a job as an aeronautical engineer was because of his expulsion from MIT for "disciplinary reasons." Because the defendants were able to present this evidence and argue their point to the jury, it does not appear that they were prejudiced by the judge's ruling. Consequently, we hold that the judge did not err by excluding evidence of the thefts as the reason for the plaintiff's expulsion from MIT.

4. *Amendment of the judgment.* The defendants claim that the judge erred in failing to amend the judgment by apportioning the damage award and subtracting any prejudgment interest attributable to damages for lost earning capacity. The defendants argue that the purpose of awarding prejudgment interest is to "compensate a damaged party for the loss of use or unlawful detention of money." *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 841 (1986), quoting from *Perkins School for the Blind* v. *Rate Setting Commn.*, 383 Mass. 825, 835 (1981). Therefore, they contend that if the plaintiff does not suffer a loss of the use of his money until after the judgment is entered (as in the case with damages for future lost earnings), then there is no basis to award prejudgment interest to compensate the plaintiff. The plaintiff cites *Carey* v. *General Motors Corp.*, 377 Mass. 736, 746 (1979), to support his contention that prejudgment interest may be applied to damages awarded for future lost earning capacity.

"[W]e view the loss of earning capacity as a present loss, although the determination of the extent of the loss necessarily takes into account future losses." *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 391 n.9 (1988). Further, this court has stated that "in tort cases for personal injuries or property damage, compensation for future lost wages will be treated

conceptually as an already incurred loss of earning capacity; while, in discrimination cases under G. L. c. 151B, expected future income reductions will be treated conceptually as losses not yet incurred . . . . The former are subject to *Carey*, and prejudgment interest under [G. L. c. 231,] § 6B will be applied to the entire amount of the verdict." *Kuppens* v. *Davies*, 38 Mass. App. Ct. 498, 500 (1995). The judge properly denied the defendants' motion.

*Judgments affirmed.*